# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 16, 2016      Decided November 8, 2016

No. 15-7055

MATTHEW AUGUST LEFANDE,
APPELLANT

v.

DISTRICT OF COLUMBIA,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00217)

---

*Matthew August LeFande*, pro se, argued the cause and filed the briefs for appellant.

*Carl J. Schifferle*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellee. With him on the brief were *Karl A. Racine*, Attorney General, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General.

Before: TATEL and KAVANAUGH, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Matthew LeFande served as a police reserve officer with the Metropolitan Police Department for fifteen years until the department fired him for making harsh and accusatory statements to his superiors in emails with his co-workers cc'd. Alleging that the emails constitute protected speech, LeFande argues that his termination violated the First Amendment. The district court disagreed, as do we. Under *Pickering v. Board of Education*, 391 U.S. 563 (1968), LeFande's emails enjoy no First Amendment protection because his interest in sending them is outweighed by the police department's interest in promoting office harmony and efficiency.

## I.

The Metropolitan Police Department (MPD) is fortified by a corps of volunteers, called police reserve officers (PROs), who assist full-time officers with their law-enforcement duties. *See* D.C. Code § 5-129.51. Appellant Matthew LeFande served as a PRO for fifteen sometimes tumultuous years from 1993 until 2008, when the MPD fired him.

For our purposes, the relevant events begin in 2006, when LeFande, who holds a law license, represented a class of PROs in a suit against the District of Columbia. In that suit, known as the *Griffith* suit, plaintiffs alleged that an MPD regulation infringed on PRO collective-bargaining rights and violated principles of procedural due process in disciplinary actions. *Griffith v. Lanier*, No. 06-01223, 2007 WL 950087 (D.D.C. Mar. 28, 2007). The district court dismissed that case, *id.* at *4, and we affirmed, *Griffith v. Lanier*, 521 F.3d 398, 404 (D.C. Cir. 2008).

In January 2008, just before LeFande appeared before this court for oral argument in *Griffith*, the MPD fired him. In

response, LeFande again sued the District, this time under 42 U.S.C. § 1983, alleging, as relevant here, that the MPD terminated him for prosecuting the *Griffith* suit in violation of his First Amendment rights. The district court granted the District's motion to dismiss, ruling that LeFande's speech—his prosecution of the *Griffith* suit—did not relate to a matter of public concern and therefore merited no First Amendment protection. *LeFande v. District of Columbia*, No. 09-00217, 2009 WL 8747515, at *4 (D.D.C. June 25, 2009). Reversing, we concluded that the *Griffith* suit did implicate a matter of public concern and remanded for the district court to conduct the remaining First Amendment analysis. *LeFande v. District of Columbia*, 613 F.3d 1155, 1161–62 (D.C. Cir. 2010).

On remand, the District moved for summary judgment, arguing that the MPD would have fired LeFande even absent his prosecution of the *Griffith* suit because of a series of emails he sent to his superiors with his co-workers cc'd. The relevant emails—their precise language is central to the issue before us—can be grouped into three sets.

First, on March 26, 2007, LeFande sent three emails pertaining to the PRO leadership's response to a disturbance in Georgetown. In the initial email, LeFande wrote that the PRO force would "be better off knocking Officer Plante [a sergeant] over on his side and rolling him towards the crowd than asking him to lead us as a unit." In the next email, LeFande proclaimed that his superiors were "suffering from full-blown delusions of adequacy." And in his last email of the day, LeFande wrote that his superiors were "planning on . . . standing around there until the crowd thins out in Georgetown" and suggested that they "write [themselves] a nice after action report [and] [m]aybe even give [themselves] some medals." LeFande sent the first email directly to certain

superiors and circulated it to a listserv of PROs. The record does not indicate who received the other two emails.

LeFande sent a second set of two emails on January 18 and 19, 2008, each of which concerned PRO Commander Charles Brown's request for a list of PRO members who were also serving as Conservators of the Peace in Virginia (another volunteer law-enforcement position). In his first of the two emails, LeFande wrote:

> Please explain why you want this information and what you intend to do with it. Absent some special authority that MPD will confer to these people by virtue of the office they hold in Virginia, or this information being used to advocate for same, I can't understand why it is any of your business. It doesn't appear you have done anything with this information since the last time you asked. Why should we continue to provide it to you?

Brown responded that the list would allow him to "better handle problems that may arise" and has "helped [him] stop or minimize disciplinary actions against Reserve Officers." LeFande shot back:

> Your track record demonstrates to the contrary. You are, more often than not, the most immediate cause of arbitrary and unwarranted disciplinary actions against Reserve Officers. You certainly are responsible for the recent arbitrary promotions process in which you promoted a cadre of persons to your personal liking regardless of their lack of qualifications. You failed to utilize the promotion exams and merit selection process required under law so that you could capriciously exclude those

critical of your perpetual incompetence. Similarly, you are personally responsible for the arming of certain Reserve Officers, including yourself, who are wholly unfit to carry firearms or who are in fact, legally disqualified from doing so. It appears to me that you are now on the hunt for more reasons to discredit and prejudice those more capable than you. You do not need a list of conservators. Instead, the police department needs a written policy in place that reflects these conservators' status as duly appointed law enforcement officers for Virginia and identifies them as exempt from firearms regulations both under District of Columbia and Federal law. If there is any question as to a conservator's status, their state issued identification credentials will give cursory confirmation of their status, which can be further confirmed by queries to the appropriate agencies. Absent any other cause for you having this information, I believe it is inappropriate for you to maintain any such list.

LeFande copied the full PRO listserv on these emails.

LeFande sent and cc'd his final email on January 25, 2008, in response to Brown's request that the PROs submit questions in advance of a meeting with an MPD Assistant Chief, so that he could "be properly briefed." LeFande wrote:

Briefed by who? You? Why even bother? You must be pretty nervous about this meeting for you to do something as contrived and clumsy as try to filter out the questions ahead of time. The whole point of this process is to spring on him all the dumb stuff you have been doing to the Corps all these years and make him squirm. Hopefully he will be embarrassed

enough to finally force you to resign. Come to think of it, let's forward this little email to him. [email address omitted] . . . Oh yeah, you suspended me without cause for doing that nine months ago and haven't reinstated me since. Let's add that to the email too.

As evidence that it fired LeFande because of these emails, the District pointed to the MPD's memorandum requesting his termination, which stated that the emails "dismiss[] authority and undermine[] the credits of official[s'] rank and deter[] the cohesive working relationships of [Reserve Corps] members." The memo also emphasized that, "[a]s the tone, tenor, content, and distribution of Reserve Officer LeFande's e-mails make[] clear, he is a disruptive force within the Reserve Corps, and his blatantly insubordinate behavior cannot help but to diminish respect for Reserve Corps officials and undermine morale within the Corps."

The district court denied the District's summary-judgment motion, concluding that the District had failed to prove as a matter of law that the MPD would have fired LeFande even absent his prosecution of the *Griffith* suit. While a jury could "find that the MPD terminated LeFande for his tendency to air complaints to the entire listserv[], or for the tone of the emails," the court explained, it could also deem these justifications pretextual. *LeFande v. District of Columbia*, No. 09-217, slip op. at 10 (D.D.C. Feb. 11, 2014) (order denying defendant's motion for summary judgment). And because LeFande's emails "likely constitute protected speech," the court thought summary judgment particularly inappropriate. *Id.* at 11.

In response to that ruling, LeFande moved for summary judgment, asserting that his emails warranted First Amendment protection as a matter of law. The district court, despite its previous statement that LeFande's emails "likely constitute protected speech," denied that motion. Relying on *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the court concluded that LeFande's emails were unprotected because he sent them "pursuant to his official duties." *LeFande v. District of Columbia*, No. 09-217, slip op. at 1–2 (D.D.C. Nov. 14, 2014) (order denying plaintiff's motion for summary judgment).

Having denied the parties' summary-judgment motions, the district court held a pretrial conference. There, LeFande explained that he had no evidence to present at trial and maintained that the only remaining issue was a legal one, i.e., whether his emails merit First Amendment protection. Because the District agreed, the district court instructed it to move to dismiss, which it did. Although LeFande never opposed the motion, he expressly reserved his right to appeal. The district court accordingly dismissed the case with prejudice, and LeFande filed this appeal.

## II.

Before addressing the merits, we must consider the District's argument that we lack appellate jurisdiction. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" (quoting *Mansfield, C. & L. M. Railway Co. v. Swan*, 111 U.S. 379, 382 (1884))). Under 28 U.S.C. § 1291, appellate courts have jurisdiction to review the final decisions of district courts. And when reviewing a final decision, they have authority to review the

interlocutory orders that preceded it based on the principle that such orders merge into the final decision. *See Ciralsky v. CIA,* 355 F.3d 661, 668 (D.C. Cir. 2004) ("Our jurisdiction over [the] final decision extends as well to the interlocutory rulings that preceded it . . . .").

The District insists that we lack jurisdiction to review the denial of LeFande's summary-judgment motion because the district court dismissed LeFande's case for failure to prosecute. *See* FED. R. CIV. P. 41(b) (allowing dismissal "[i]f the plaintiff fails to prosecute or to comply with these rules or a court order"). Despite the general rule that interlocutory orders merge into the final decision, our sister circuits disagree about whether they can review interlocutory orders after a dismissal for failure to prosecute. *Compare, e.g.*, *John's Insulation, Inc. v. L. Addison & Associates*, 156 F.3d 101, 105–07 (1st Cir. 1998) (declining review), *with Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179 (2d Cir. 1990) (permitting review). This circuit has yet to weigh in on the question, and we need not do so now since we reject the District's premise that the dismissal here was triggered by a failure to prosecute.

Although the district court failed to ground its order in a Federal Rule of Civil Procedure, the circumstances surrounding the dismissal—specifically, the pretrial conference—convince us that it rested not on Rule 41(b), but rather Rule 41(a)(2), which allows a court to dismiss an action "at the plaintiff's request . . . on terms that the court considers proper." FED. R. CIV. P. 41(a)(2). At the pretrial conference, LeFande took the position that only legal issues remained at stake and accordingly asked the district court to dismiss the case so he could seek immediate review of the summary-judgment denial. *See* Pretrial Conference Tr. 3 (Apr. 28, 2015) ("We're only left with the matter of law of whether

[LeFande's] speech was protected speech."); *id.* at 6 ("We agree to [the case] being dismissed. We just want to reserve our rights for appeal."). The district court agreed to facilitate this request, saying it would try to "tee [the case] up properly for plaintiff to take [his] appeal." *Id.* at 6. Though the District ultimately moved for dismissal, it was LeFande who initially "request[ed]" the dismissal, which the district court granted on "terms [it] consider[ed] proper." *See* FED. R. CIV. P. 41(a)(2). The dismissal therefore qualifies as a Rule 41(a)(2) voluntary dismissal.

The District nonetheless contends that LeFande bears sole responsibility for the case not going to trial, assuring us that it had "intended to proceed with the trial and present its own evidence." Appellee's Br. 17. This is an odd assertion given what actually transpired at the pretrial conference. Not only did the District agree that no factual issues remained contested, *see* Pretrial Conference Tr. 5 (responding "[n]o" when asked by the district court whether any facts were in dispute), but, as noted above, it also *moved to dismiss the case*, *id.* at 6 ("We move to dismiss."). The District's argument, moreover, completely ignores that the dismissal here bears no resemblance to dismissals for failure to prosecute, which are prompted by plaintiffs' egregious and dilatory conduct, such as flouting court orders. *See Bristol Petroleum Corp. v. Harris*, 901 F.2d 165, 167–68 (D.C. Cir. 1990). LeFande did nothing of the sort, as he merely voiced his preference to appeal immediately rather than proceed to trial.

For these reasons, we shall construe the district court's order as a Rule 41(a)(2) voluntary dismissal with prejudice— an appealable final decision under 28 U.S.C. § 1291 because it completely ends the litigation on the merits. *See Blue v. District of Columbia Public Schools*, 764 F.3d 11, 17 (D.C.

Cir. 2014). And since the denial of LeFande's summary-judgment motion merges into that final decision, it too is reviewable. *See Public Citizen v. United States District Court for the District of Columbia*, 486 F.3d 1342, 1345 (D.C. Cir. 2007) (holding that a summary-judgment denial may be reviewed "where it is accompanied by a final order disposing of all issues before the district court" (quoting *Jones-Hamilton Co. v. Beazer Materials & Services, Inc.*, 973 F.2d 688, 694 n.2 (9th Cir. 1992))).

With our statutory jurisdiction established, the only remaining question is whether we have Article III jurisdiction. Although the parties never address this issue, courts must always assure themselves that they have constitutional jurisdiction. *See Steel Co.*, 523 U.S. at 101–02. Article III appellate jurisdiction over voluntary dismissals with prejudice is a largely uncharted doctrinal area, though the Supreme Court will soon hear a case concerning the issue. *See Microsoft Corp. v. Baker*, 136 S. Ct. 890, 890–91 (2016) (mem.) (granting certiorari). In that case, the parties disagree about whether appellate courts can review a denial of class certification after the named plaintiffs voluntarily dismiss their claims with prejudice given Article III's requirement that the plaintiff remain adverse to the defendant "at all stages of review, not merely at the time the complaint is filed." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)). Without speaking to the unique context of class actions—which is unnecessary in this case—we think that Article III jurisdiction exists to review the voluntary dismissal with prejudice here.

The Supreme Court last addressed the reviewability of voluntary dismissals in *United States v. Procter & Gamble Co.*, 356 U.S. 677 (1958). There, the Court held that the

plaintiff, the government in that case, could obtain review of an interlocutory ruling by voluntarily dismissing the case with prejudice because "[w]hen the Government proposed dismissal . . ., it had lost on the merits [due to the interlocutory ruling] and was only seeking an expeditious review." *Id.* at 680–81. In other words, the government had never "consent[ed] to a judgment against [it], but only that, if there was to be such a judgment, it should be final in form instead of interlocutory." *Id.* at 681 (quoting *Thomsen v. Cayser*, 243 U.S. 66, 83 (1917)). The same is true here. When the district court denied LeFande's summary-judgment motion and concluded that his emails deserve no First Amendment protection, LeFande effectively lost on the merits: after all, he claimed only that firing him based on those emails violated the First Amendment. LeFande's voluntary dismissal with prejudice, then, served solely as a means to facilitate immediate review of a case-dispositive interlocutory ruling.

*Procter & Gamble* therefore governs and, although the Court there did not speak in terms of Article III adverseness, it necessarily found Article III's strictures satisfied because it reviewed the plaintiff's appeal. Accordingly, because LeFande's voluntary dismissal with prejudice followed a case-dispositive interlocutory ruling, we have Article III jurisdiction. *Accord OFS Fitel, LLC v. Epstein, Becker and Green, P.C.*, 549 F.3d 1344, 1356–58 (11th Cir. 2008) (holding that voluntary dismissals with prejudice following case-dispositive rulings are reviewable); *Laczay v. Ross Adhesives*, 855 F.2d 351, 354–55 (6th Cir. 1988) (same). And as a result, the broader question whether Article III appellate jurisdiction exists over *all* voluntary dismissals with prejudice, even those that do not follow case-dispositive interlocutory rulings, is not implicated.

We can easily dispose of the District's final two jurisdictional objections. First, our holding poses no threat to "the longstanding policy against piecemeal litigation." Appellee's Br. 18 (quoting *Franklin v. District of Columbia*, 163 F.3d 625, 629 (D.C. Cir. 1998)). Of course, reviewing cases that plaintiffs have voluntarily dismissed *without prejudice* could jeopardize that policy given that plaintiffs would suffer no adverse consequences from dismissing after an interlocutory ruling and pursuing an appeal. *See Robinson-Reeder v. American Council on Education*, 571 F.3d 1333, 1340 (D.C. Cir. 2009) (discussing how permitting dismissals without prejudice to "generate an appealable judgment" would "weaken the policy against 'piecemeal appeals'"). But where, as here, the plaintiff voluntarily dismisses the case *with prejudice*, he wagers his entire case on prevailing on appeal—thereby creating a disincentive against this practice. *See, e.g.*, *Walton v. Bayer Corp.*, 643 F.3d 994, 998 (7th Cir. 2011) ("[When a] plaintiff wager[s] her entire claim on being proved right about [an interlocutory ruling], considerations of judicial economy justif[y] immediate appellate review.").

Second, the District claims that because "we are powerless to review a challenge to the legal sufficiency of evidence that was rejected at summary judgment and not brought again in a [post-trial] Rule 50 motion," *see Feld v. Feld*, 688 F.3d 779, 781 (D.C. Cir. 2012), we also lack authority to review the summary-judgment denial here. We disagree. Where a case proceeds to trial, the trial record supersedes the earlier summary-judgment record and renders the summary-judgment denial moot. *Id.* at 782. But where, as here, no trial takes place—and hence no further facts are developed—nothing has superseded the summary-judgment record and therefore nothing prevents our review.

Having confirmed our constitutional and statutory jurisdiction to review the district court's voluntary dismissal with prejudice, as well as the summary-judgment denial that preceded it, we turn to the merits.

## III.

The district court denied LeFande's summary-judgment motion, concluding that his emails enjoy no First Amendment protection. We review this summary-judgment denial de novo, drawing all inferences in favor of the District as the nonmovant. *See Public Citizen*, 486 F.3d at 1345. Summary judgment is proper only when there is "no genuine issue of any material fact," or when "the movant is clearly entitled to prevail as a matter of law." *Id.* (quoting *Pomerantz v. County of Los Angeles*, 674 F.2d 1288, 1290 (9th Cir. 1982)).

We use a four-element test to determine whether a public employee has established a claim of retaliation in violation of his First Amendment rights. For the employee to prevail: (1) he must have spoken as a citizen on a matter of public concern; (2) his interest in speaking on matters of public concern must outweigh the government's interest in promoting efficiency; (3) his protected speech must have been a substantial or motivating factor in prompting the retaliation; and (4) the government must be unable to show that it would have reached the same decision absent the protected speech. *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007). The first two elements involve questions of law; the second two implicate questions of fact. *Id.*

The parties spill much ink debating whether LeFande spoke "pursuant to his official duties." *See Garcetti*, 547 U.S. at 421 ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes . . . ."). We need not

decide this question, however, because even if LeFande spoke as a citizen on a matter of public concern, his claim falters on the second element. *See, e.g.*, *Rock v. Levinski*, 791 F.3d 1215, 1219 (10th Cir. 2015) (skipping the first element of the employee-speech analysis and resolving the claim based on the *Pickering* balancing test); *see also Bowyer v. District of Columbia*, 793 F.3d 49, 53 (D.C. Cir. 2015) ("On de novo review, we may affirm the district court's judgment on a different theory than used by the district court.").

That element, according to *Pickering v. Board of Education*, 391 U.S. 563 (1968), requires weighing LeFande's interest "as a citizen, in commenting upon matters of public concern" against the MPD's interest "as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568. The Supreme Court has set forth several factors to consider in conducting this test, such as "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). In *Connick v. Myers*, 461 U.S. 138 (1983), moreover, the Court made clear that a government employer can intervene *before* an employee's speech actually disrupts the functioning of an office. "[W]e do not see the necessity," the Court explained, "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Id.* at 152.

The facts of *Connick* are instructive in balancing the interests in this case. There, the government fired an Assistant District Attorney who had distributed a "questionnaire

soliciting the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Id.* at 141. In sustaining the employee's termination, the Court explained that it owed "a wide degree of deference to the employer's judgment" that the employee had committed "an act of insubordination which interfered with working relationships." *Id.* at 151–52. That said, the Court acknowledged that a "stronger showing" of interference with the employer's operation "may be necessary if the employee's speech more substantially involved matters of public concern." *Id.* at 152.

Here, as explained above, the MPD set forth its rationale for terminating LeFande in its "Request for Removal" memorandum. That document states that LeFande's emails "dismiss[] authority and undermine[] the credits of official[s'] rank and deter[] the cohesive working relationships of [Reserve Corps] members." It concludes that, "[a]s the tone, tenor, content, and distribution of . . . LeFande's e-mails makes clear, he is a disruptive force within the Reserve Corps, and his blatantly insubordinate behavior cannot help but to diminish respect for Reserve Corps officials and undermine morale within the Corps." Under *Connick*, we must afford such determinations "a wide degree of deference." 461 U.S. at 152. Moreover, as we have emphasized, "there may be a stronger governmental interest in regulating the speech of police officers than in regulating the speech of other governmental employees," in light of the "special degree of trust and discipline required in a police force." *O'Donnell v. Barry*, 148 F.3d 1126, 1135 (D.C. Cir. 1998). With this deferential framework in mind, and viewing the facts in the light most favorable to the District as the nonmovant, we now

subject each of LeFande's emails to the *Pickering* balancing test.

In LeFande's March 26, 2007 emails, he ridiculed his superiors' handling of a disturbance in Georgetown, writing that the department would be better off "knocking [a sergeant] over on his side and rolling him towards the crowd than asking him to lead [the PRO] unit," and that his superiors "suffer[ed] from full-blown delusions of adequacy" and should "give [themselves] some medals." In our view, these statements about the inadequacy of office leadership, like the survey question in *Connick* relating to employees' confidence in their supervisors, have the "likely result [of] . . . precipitat[ing] a vote of no confidence" in LeFande's superiors. As such, LeFande's statements "carr[y] the clear potential for undermining office relations." *Connick*, 461 U.S. at 152. In addition, because those statements expressly disrespect LeFande's superiors, they go further to "impair[] discipline," *Rankin*, 483 U.S. at 388, than did the implicitly derisive survey questions in *Connick*. To be sure, LeFande's March 26 emails may implicate matters of public concern to a greater extent than the questionnaire in *Connick* since they relate to public safety as opposed to matters of internal office policy. But given the "special degree of trust and discipline required in a police force," *O'Donnell*, 148 F.3d at 1135, LeFande's speech-related interests in sending these emails cannot outweigh the fact that their "disruptive force" (the MPD's description) threatens workplace efficiency.

LeFande's January 18 and 19, 2008 emails must be read together since they amount to a single response to Commander Brown's request for a list of PROs also serving as Virginia Conservators of the Peace. In his January 18 email, LeFande wrote that he failed to "understand why [the requested information] is any of your business," demanding to

know "[w]hy should we continue to provide it to you . . . [given that] [i]t doesn't appear you have done anything with [it] since the last time you asked[?]" After Brown explained why he needed the information, LeFande still refused to comply. Instead, in his January 19 email, he launched a slew of attacks against Brown, charging, among other things: "[y]ou certainly are responsible for the recent arbitrary promotions process in which you promoted a cadre of persons to your personal liking regardless of their lack of qualifications"; "you . . . capriciously exclude those critical of your perpetual incompetence"; "you are personally responsible for the arming of certain Reserve Officers, including yourself, who are wholly unfit to carry firearms"; and "you are now on the hunt for more reasons to discredit and prejudice those more capable than you." LeFande cc'd the PRO listserv.

It goes without saying that resisting a superior's routine request for information both "impairs discipline" and "interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388. Viewing the record in the District's favor, as we must, we do not think that the requested information was particularly sensitive or that the request was unwarranted or burdensome. If police department leadership faced opposition from employees after every routine request, the machinery of law enforcement would grind to a halt.

More fundamentally, when we consider the "manner" and "context" of these emails, *id.*, they read more as personal attacks on Brown than as proposals for improving departmental policy. LeFande's repeated use of the word "you" in reference to Brown himself, as well as his harsh and accusatory tone—"perpetual incompetence," "capriciously exclude," "wholly unfit"—scapegoat Brown instead of targeting general policies in a way that might foster

meaningful reform. Not only are such personal attacks on supervisors likely to jeopardize employee confidence in office leadership and impair overall discipline, but they are also just the type of "act of insubordination" (the MPD called it "blatantly insubordinate behavior") that employers have wide latitude to address before actual office disruption occurs. *See Connick*, 461 U.S. at 151–52; *Graziosi v. City of Greenville*, 775 F.3d 731, 740–41 (5th Cir. 2015) (holding that a police officer's posts on the local Mayor's public Facebook page criticizing departmental leadership failed the balancing test because they "smack[ed] of insubordination" (quoting *Nixon v. City of Houston*, 511 F.3d 494, 499 (5th Cir. 2007))).

It is true that, on a more general level, the subject of these emails—police personnel policy and public safety—is one of public concern. *See LeFande*, 613 F.3d at 1161 ("[W]e reject the proposition that a personnel matter per se cannot be a matter of public concern, even if it may seriously affect the public welfare."). But "[w]hen a government employee personally confronts his immediate superior," the Court has emphasized, "the [employer's] institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered." *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415 n.4 (1979). Here, LeFande's personal and inflammatory confrontation of Brown, combined with the visibility of the emails, could well frustrate the police department's ability to ensure a functional force.

A similar analysis applies to LeFande's January 25, 2008 email. There, LeFande responded to Brown's request for questions in advance of a briefing with the Assistant Chief as follows: "Briefed by who? You? Why even bother? You must be pretty nervous about this meeting for you to do something as contrived and clumsy as try to filter out the questions ahead

of time. The whole point of this process is to spring on [the Assistant Chief] all the dumb stuff you have been doing to the Corps all these years and make him squirm. Hopefully he will be embarrassed enough to finally force you to resign." LeFande's caustic words—"clumsy," "dumb," "contrived"— undercut Brown's authority by flouting his request and ridiculing him in an open forum. For the reasons just mentioned, such personal attacks hurled at a superior can subvert office discipline and efficiency. LeFande assures us that he was seeking to blow the whistle on an official obfuscating his wrongdoings. *See* Oral Arg. Rec. 5:50–:59. Perhaps so. But, and again viewing the facts most favorably to the District, we see nothing in Brown's request for questions—which he justified as necessary to allow for more thorough and timely answers—that even hints at an illicit motive. As a result, this email falls far short of cutting to the heart of "public concern," *Pickering*, 391 U.S. at 568, and the MPD's interest in containing overt hostility toward its leadership outweighs any speech-related interest LeFande had in sending the email.

In conclusion, none of LeFande's emails survives the *Pickering* balancing test. The First Amendment protects public-employee speech only so much. In this case, it does not require the MPD to tolerate LeFande's hostile and accusatory words.

## IV.

For the foregoing reasons, we affirm the district court's dismissal of the case and denial of LeFande's summary-judgment motion.

*So ordered.*