# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 14, 2025          Decided April 21, 2026

No. 24-5218

UNITED STATES OF AMERICA,
APPELLEE

v.

ALL PETROLEUM-PRODUCT CARGO ONBOARD THE M/T ARINA
WITH INTERNATIONAL MARITIME ORGANIZATION NUMBER
9189952 AND ALL PETROLEUM-PRODUCT CARGO ONBOARD
THE M/T NOSTOS WITH INTERNATIONAL MARITIME
ORGANIZATION NUMBER 9258014,
APPELLEES

ASPAN PETROKIMYA CO.,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-03234)

*Michael J. Satin* argued the cause for appellant. With him
on the briefs was *Timothy P. O'Toole*.

*Katherine Twomey Allen*, Attorney, U.S. Department of
Justice, argued the cause for appellee. With her on the brief
were *Jeanine Ferris Pirro*, U.S. Attorney, and *Brian P. Hudak*,
Assistant U.S. Attorney.

2

Before: HENDERSON, KATSAS and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARCIA.

GARCIA, *Circuit Judge*: In the fall of 2021, the United States seized over 700,000 barrels of crude oil from two tankers in the Mediterranean Sea. According to the government, that oil is subject to civil forfeiture because it belonged to the National Iranian Oil Company, an entity that has materially supported the Iranian military's terrorist activities. A private commodities trading company claimed ownership of the oil and moved to dismiss the forfeiture action on the grounds that the United States did not adequately plead several elements of its forfeiture claim. The district court denied that motion. We affirm.

**I**

Congress has designated certain property "subject to forfeiture to the United States." 18 U.S.C. § 981(a)(1). That category includes "[a]ll assets" of any entity "engaged in planning or perpetrating any [] Federal crime of terrorism . . . against the United States." *Id.* § 981(a)(1)(G)(i). A "Federal crime of terrorism," in turn, is any of several enumerated offenses, so long as it is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Id.* § 2332b(g)(5). Those enumerated offenses include "knowingly provid[ing] material support or resources to a foreign terrorist organization." *Id.* § 2339B(a)(1). The material-support statute provides extraterritorial jurisdiction over that offense if it "occurs in or affects interstate or foreign commerce." *Id.* § 2339B(d)(1)(E).

The government's Amended Complaint alleges the following facts. The National Iranian Oil Company (NIOC)

is a state-owned enterprise responsible for producing and exporting Iranian oil and petroleum. NIOC generates billions of dollars of annual revenue and provides between one-third and two-thirds of the Iranian government's total revenue. Among the beneficiaries of that funding are the Islamic Revolutionary Guard Corps and its Qods Force (collectively, the IRGC), branches of the Iranian military responsible for terrorist activities worldwide, including attacks on U.S. officials, servicemembers, and civilians. *See* Am. Compl. ¶ 20 (describing the IRGC's role in bombings that have killed and injured U.S. civilians and military personnel). The United States designated the IRGC a Foreign Terrorist Organization in 2019. NIOC cooperates and coordinates directly with the IRGC, including by acting as its "agent or affiliate" and selling oil on its behalf. *Id.* ¶¶ 25–26, 41. More generally, "Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities." *Id.* ¶ 13.

In October 2020, the Stark I—a ship owned by the National Iranian Tanker Company, a subsidiary of NIOC—loaded several hundred thousand barrels of crude oil at Kharg Island, Iran. The Stark I then traveled west into the Persian Gulf and, in November 2020, conducted a ship-to-ship transfer of the oil to a tanker called the Arina. Documents generated by NIOC indicate that the transfer involved a consignment of oil from NIOC to another one of its subsidiaries, Naftiran Intertrade. Nine months later, in August 2021, the Arina engaged in a second ship-to-ship transfer, offloading a portion of the oil onto a vessel called the Nostos.

Following the Arina-to-Nostos transfer, the United States obtained and executed warrants to seize the oil aboard both vessels. The United States then brought two civil-forfeiture complaints (one for each ship) and named the seized oil as Defendant Property. The government alleged that the

Defendant Property belonged to an entity—NIOC's subsidiary, the National Iranian Tanker Company—that materially supported terrorism by facilitating oil sales for the IRGC. With judicial approval, the United States conducted interlocutory sales of the Defendant Property for over $50 million.

In April 2022, Aspan Petrokimya Co.—a Turkish commodities trading company—claimed ownership of the Defendant Property and sought to recover the proceeds from the interlocutory sales. Aspan moved to dismiss the government's forfeiture complaints, and the district court granted the motions without prejudice. The district court concluded that the government did not adequately plead that "NIOC's sale of Iranian crude oil affects foreign commerce." J.A. 260.

The United States filed an Amended Complaint that consolidated the two forfeiture actions and included additional factual allegations about NIOC's activities, its relationship to the IRGC, and the impact of its transactions on international oil markets. Aspan again moved to dismiss, but this time the district court denied the motion. The district court explained that the Amended Complaint "remedied the defect" of the initial complaints as to the jurisdictional element and adequately alleged all other elements of the civil-forfeiture statute. J.A. 61.

Seeking to expedite appellate review, Aspan filed an answer admitting all factual allegations in the Amended Complaint, consented to entry of judgment on the pleadings in favor of the United States, and preserved its right to appeal. The district court entered final judgment, and Aspan timely appealed.

## II

This court has jurisdiction over Aspan's appeal from the district court's final judgment, and we may review the preceding denial of Aspan's motion to dismiss "based on the principle that [interlocutory] orders merge into the final decision." *LeFande v. District of Columbia*, 841 F.3d 485, 491 (D.C. Cir. 2016). "We review denials of motions to dismiss *de novo*." *Bombardier Corp. v. Nat'l R.R. Passenger Corp.*, 333 F.3d 250, 252 (D.C. Cir. 2003). Under the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In forfeiture actions like this one, the Federal Rules are modified by the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. Under Supplemental Rule G, a forfeiture complaint must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Fed. R. Civ. P. Supp. R. G(2)(f). Neither party suggests that the Rule G standard materially differs from the *Twombly-Iqbal* standard, so we proceed on that understanding. *See* Appellant's Brief 15.

Aspan raises three independent challenges to the district court's denial of its motion to dismiss. It argues that the Amended Complaint does not adequately allege (1) that NIOC owned the Defendant Property; (2) that NIOC's material-support offense "affects . . . foreign commerce" under Section 2339B(d)(1)(E); and (3) that NIOC's offense was "calculated to influence" government conduct per Section 2332b(g)(5). We address—and reject—each argument in turn.

**A**

The Amended Complaint alleges that the Defendant Property is subject to forfeiture because it "is the property of NIOC or its subsidiaries"—entities engaged in "perpetrat[ing] a federal crime of terrorism." Am. Compl. ¶ 66. Aspan argues that the government failed to plausibly allege that NIOC owned the Defendant Property. "At most," Aspan contends, the United States has shown that NIOC and its subsidiaries "transported Iranian oil" but "not that they owned it." Appellant's Brief 42.

This dispute turns largely on a temporal question: As of what time should ownership be assessed? Aspan asserts that we must examine ownership "at the time of seizure." *Id.* at 43. The government counters that it need only plead that NIOC owned the property at the time of the offense giving rise to forfeiture. *See* Appellee's Brief 56–57.

The government is correct. The forfeiture statute provides that "[a]ll right, title, and interest in property" subject to forfeiture "shall vest in the United States upon commission of the act giving rise to forfeiture." 18 U.S.C. § 981(f). That text is squarely governed by the Supreme Court's holding that "whenever a statute enacts that upon the commission of a certain act specific property used in or connected with that act shall be forfeited, the forfeiture takes effect immediately upon the commission of the act." *United States v. Stowell*, 133 U.S. 1, 16 (1890). Although a judicial proceeding must "perfect[]" the government's title, that title, "when obtained, relates back" to "the time the offense is committed." *Id.* at 17. This "long-recognized" relation-back rule applies in cases involving civil and criminal forfeiture provisions that are materially identical to the one before us now. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 627 (1989); *see United States v. 92 Buena Vista Ave.*, 507 U.S. 111,

129 (1993) (plurality opinion); *United States v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185, 1191 (D.C. Cir. 1995); *see also* 1 David B. Smith, Prosecution and Defense of Forfeiture Cases ¶ 3.05[2] (2025) ("[A] judgment of forfeiture 'relates back' to the date of the offense subjecting the property to forfeiture."). As a result, title (albeit imperfect title) vested in the United States when the forfeiture-inducing offense occurred. There is no need to show that NIOC owned the property at any later time, such as the time of seizure.

Here, the Amended Complaint adequately alleges that NIOC owned the Defendant Property at the time of the offense giving rise to forfeiture. That offense is NIOC's material support for the IRGC by acting as its "agent or affiliate" in international oil transactions. Am. Compl. ¶ 26. The Amended Complaint alleges such support as early as 2012 and continuing through the present day. *Id.* ¶¶ 24–28. The offense was thus ongoing when the Defendant Property was transferred from the Stark I to the Arina in November 2020. And the Amended Complaint alleges facts permitting a reasonable inference that, at least at that time, NIOC owned the Defendant Property. Certificate of Origin documents produced by NIOC identify NIOC as the consignor of the oil in that transaction, *id.* ¶ 56—a designation ordinarily associated with the "true owner," 5 Hawkland, UCC Series § 9-319:1 (2025). Moreover, the Amended Complaint's allegations describing NIOC's role as the Iranian government entity responsible for the country's oil transactions further support the same inference. *See* Am. Compl. ¶ 22.

Aspan counters that Certificate of Origin documents primarily "verify[] the geographical origin of goods." Appellant's Brief 43. That may well be true. We do not suggest that these documents definitively establish who had title to the Defendant Property. But at the motion-to-dismiss stage, documents identifying NIOC as the oil's consignor

combined with NIOC's central position in the Iranian oil industry support a reasonable inference that the Defendant Property belonged to NIOC at the time of NIOC's alleged offense.

**B**

Aspan next argues that the Amended Complaint does not adequately allege the jurisdictional element of the material-support offense.

This forfeiture action is premised on the allegation that NIOC "perpetrated a federal crime of terrorism" by "knowingly providing material support to a designated terrorist organization," the IRGC. Am. Compl. ¶ 66. The material-support statute prohibits such conduct and confers "jurisdiction over an offense" that "occurs in or affects interstate or foreign commerce." 18 U.S.C. § 2339B(d)(1)(E). The parties agree, and so we assume, that this jurisdictional element shares its meaning with the Foreign Commerce Clause: An activity affects commerce for purposes of the material-support statute if that effect would be sufficient to justify congressional regulation. *See* Appellant's Brief 21; Appellee's Brief 29.

The Constitution authorizes Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. Aspan argues that the Foreign Commerce Clause—and, by extension, the material-support statute—requires a "nexus to the United States" in the form of an act in "foreign commerce" with "a significant connection between that commerce and the United States." Appellant's Brief 20–21. More specifically, Aspan asserts that the Foreign Commerce Clause reaches only "commerce that itself involves the United States" and should be construed more narrowly than the Interstate Commerce Clause. *Id.* at 23. In support of this theory, Aspan relies on a close reading of the text of the Foreign Commerce Clause,

out-of-circuit authorities, and separate writings of several Supreme Court Justices. *Id.* at 21–23.

Irrespective of those arguments' force, they are foreclosed by our precedent. In *United States v. Park*, 938 F.3d 354 (D.C. Cir. 2019), we held that the Foreign Commerce Clause incorporates the same "framework" and is "at least as expansive" as the Interstate Commerce Clause. *Id.* at 371–72. The Interstate Commerce Clause, we explained, permits Congress to regulate even local activity that indirectly but "substantially affect[s]" interstate commerce. *Id.* at 371 (quoting *United States v. Lopez*, 514 U.S. 549, 559 (1995)). And we held that the Foreign Commerce Clause similarly permits Congress to regulate transactions occurring entirely abroad so long as they substantially affect commerce with the United States. *Id.* at 372; *see also In re Sealed Case*, 936 F.3d 582, 591 (D.C. Cir. 2019).

We have twice applied that "effects test" to find the Foreign Commerce Clause applicable without needing to "define . . . the precise level of 'effect' necessary," because the allegations sufficed "under any version of the test." *Sealed Case*, 936 F.3d at 591; *see also Park*, 938 F.3d at 372. The same is true here.

As pleaded, NIOC's material-support of the IRGC consists of NIOC's supply, transport, and sale of oil for the IRGC's benefit. At the outset, we agree with Aspan that the relevant conduct is not so broad as to encompass all of NIOC's "general commercial activities." Appellant's Brief 27–28. But it is also not so narrow as to include only transactions involving the "seized property." *Id.* at 18. The question is whether NIOC's conduct underlying its material-support offense has the requisite effect, and the Amended Complaint alleges that NIOC trafficked oil to support the IRGC for several years leading up to the seizure of the Defendant Property.

Those sustained dealings form the offense that is the focus of our analysis.

The Amended Complaint admittedly does not define the precise scope of that offense, and so leaves unclear exactly how much of NIOC's profits have supported the IRGC as opposed to the rest of the Iranian government. *See* Am. Compl. ¶ 24 (noting NIOC's support for the entire Iranian government). But the Amended Complaint does allege that NIOC generates billions of dollars of oil revenue each year. *See id.* ¶ 23. And it alleges that a substantial portion of that activity—amounting to many millions of dollars—benefits the IRGC. *Id.* ¶¶ 40–41. Given that this is no "minor offense," it is unnecessary to define its breadth with precision to assess whether it would have the requisite effect on foreign commerce. *Sealed Case*, 936 F.3d at 591.

That effect is plain based on the allegations in the Amended Complaint: By conducting millions of dollars of sanctioned oil transactions and related activities in support of the IRGC, NIOC is alleged to play a significant role in a black market that predictably impacts U.S. commerce. Per the Amended Complaint, fluctuations in this black market frequently influence oil prices in the United States. Thus, even if none of the oil traded by NIOC for the IRGC's benefit was "ultimately headed" to the United States, and even if we only know the quantity of that oil was "large," the scope of the offense suggests "a significant effect" on energy markets in which the United States participates. *Id.* at 591–92. Under our precedent, that offense constitutes an activity that substantially affects commerce within the meaning of the Foreign Commerce Clause.

## C

Finally, Aspan challenges the district court's conclusion that the Amended Complaint adequately pleads that NIOC's

material-support offense was "calculated to influence" government conduct.

In a forfeiture action based on a "Federal crime of terrorism," the forfeiture-inducing "offense" must be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). Aspan argues that the offense must be so calculated specifically with respect to the *United States government* because the civil-forfeiture statute itself reaches only offenses "against the United States." *Id.* § 981(a)(1)(G)(i). We assume without deciding that this aspect of Aspan's interpretation is correct. The issue, then, is whether NIOC's alleged material-support offense here was "calculated" to influence the conduct of the U.S. government. In approaching that question, we consider whether the facts support "plausible inferences" that NIOC's conduct was so calculated. *United States v. Mohammed*, 693 F.3d 192, 201–02 (D.C. Cir. 2012).

The calculation requirement is akin to an intent requirement. We have twice referred to it as such. *See United States v. Khatallah*, 41 F.4th 608, 648 (D.C. Cir. 2022); *Mohammed*, 693 F.3d at 201–02. And that is the consensus view among other courts of appeals that have addressed the question in more depth. *See United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010); *United States v. Hassan*, 742 F.3d 104, 148–50 (4th Cir. 2014); *United States v. Wright*, 747 F.3d 399, 408–09 (6th Cir. 2014); *United States v. Mohamed*, 757 F.3d 757, 759–60 (8th Cir. 2014); *United States v. Alhaggagi*, 978 F.3d 693, 700 (9th Cir. 2020); *United States v. Ansberry*, 976 F.3d 1108, 1127 (10th Cir. 2020); *United States v. Arcila Ramirez*, 16 F.4th 844, 852–54 (11th Cir. 2021). As those courts explain, the "ordinary and plain meaning of 'calculated' is planned to accomplish a purpose or intended." *Arcila Ramirez*, 16 F.4th at 852 (citing dictionary definitions); *see*

*Awan*, 607 F.3d at 317 (similar). Thus, to fall within the scope of Section 2332b(g)(5)(A), the defendant must have "acted with the purpose of influencing or affecting government conduct and planned his or her actions with this objective in mind." *Wright*, 747 F.3d at 408.

Other circuits have also provided two helpful and persuasive clarifications in applying the calculation requirement. First, calculation is not the same as "motive." The statute requires the actor to commit an offense that is calculated to affect government conduct, even if that effect "is not his personal motivation." *Awan*, 607 F.3d at 317; *see also Wright*, 747 F.3d at 408 (explaining that "influencing the government" need not "be the defendant's ultimate or sole aim"). Second, the calculation requirement can be met through reasonable inferences based on objective "circumstantial evidence." *Arcila Ramirez*, 16 F.4th at 854. That evidence might include evidence of a defendant's "knowledge" that his activities could "influence government conduct." *Id.*; *see also United States v. Chandia*, 675 F.3d 329, 340 (4th Cir. 2012). So, combining the two points, "a person who murders a head of state, for instance, sure in the knowledge that his crime will influence or affect the conduct of government, satisfies the terms of § 2332b(g)(5)(A) even if his particular *motivation* in committing the murder is to impress a more established terrorist with his abilities." *Awan*, 607 F.3d at 317.

With this understanding in mind, we agree with the district court that the Amended Complaint adequately alleges facts supporting a reasonable inference that NIOC's material-support offense was calculated to affect the U.S. government. The United States has alleged that NIOC plays a major role in funding the Iranian government in general and the IRGC in particular. It has also alleged that NIOC and the IRGC are closely intertwined—that NIOC is an "agent or affiliate of the

IRGC" and that the two actively coordinate. Am. Compl. ¶ 26; *see also id.* ¶ 41. And the Amended Complaint details at length how the IRGC's activities are aimed at influencing the U.S. government, with the IRGC using "terrorism as a tool of statecraft" focused specifically on the United States. *Id.* ¶ 16. On these allegations, it is reasonable to infer that NIOC not only knew but in fact intended that its substantial support for the IRGC would be put toward one of the IRGC's primary aims: using terrorism to affect the United States government.

To support its contrary argument, Aspan draws on cases in which we have declined to impute even knowledge to entities accused of supporting terrorism. Those cases involve aiding-and-abetting liability under the Anti-Terrorism Act, which "requires a defendant be 'generally aware of its role in an overall illegal activity from which an act of international terrorism was a foreseeable risk.'" *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 867 (D.C. Cir. 2022) (quoting *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 220 (D.C. Cir. 2022)). In *Bernhardt*, the plaintiff argued that a defendant bank had such awareness because it allegedly conducted business with intermediary banks who in turn dealt with al-Qaeda. *Id.* at 868. We rejected that argument, even though the intermediaries included "nationalized Iranian banks" and "Iran has historically supported" al-Qaeda. *Id.* We explained that "sovereign nations invariably maintain legitimate government activities." *Id.* So, at least without other allegations showing that the intermediary banks were "closely intertwined with al-Qaeda" and that the defendant bank was aware of those close "connections," the complaint did not adequately plead that the bank "was generally aware that its financial dealings with intermediary banks supported al-Qaeda's terrorist acts." *Id.* We reached a similar conclusion on analogous facts in another Anti-Terrorism Act case, *Keren Kayemeth LeIsrael-Jewish National Fund v.*

14

*Education for a Just Peace in the Middle East*, 66 F.4th 1007 (D.C. Cir. 2023). There, the plaintiff alleged that the defendant nonprofit was aware that its donations to a Palestinian boycott committee would support terrorist activities by Hamas. We rejected that claim in part because the intermediary engaged mainly in "lawful civil resistance." *Id.* at 1017. Aspan draws on those cases to argue that because the IRGC engages in a range of activities, we cannot automatically "infer that any support provided to [the IRGC] must have been calculated to influence U.S. conduct." Appellant's Brief 40.

The government's allegations here, however, are meaningfully distinct. As an initial matter, the government has not simply claimed that NIOC supports the "sovereign state" of Iran. *Bernhardt*, 47 F.4th at 865. Rather, the claim is that NIOC specifically supports the IRGC—an entity that is itself designated as a Foreign Terrorist Organization. And as recounted above, NIOC is not alleged to be a minor and indirect supporter of the IRGC through some independent intermediary. Instead, NIOC is a major and direct source of funding for the IRGC. Indeed, both entities are arms of the Iranian government, and they are "closely intertwined." *Id.* at 868. If the relevant actors had a more tenuous relationship, we would be reluctant to "impute" knowledge, let alone calculation. *Keren Kayemeth*, 66 F.4th at 1017. But in this context, we have little trouble concluding that it is reasonable to infer that NIOC calculated its support of the IRGC to further the IRGC's terrorist activities aimed at influencing the United States, one of the IRGC's primary targets. The Amended Complaint therefore adequately alleges that NIOC's material-support offense was calculated to affect the U.S. government.

15

## D

The district court also ruled that forfeiture was supported on an alternative theory: Even if the Defendant Property's owner was not an entity "engaged in planning or perpetrating" a "Federal crime of terrorism," it afforded its owner "a source of influence over any such entity." 18 U.S.C. § 981(a)(1)(G)(i). Because we find that the Amended Complaint adequately alleges that the owner of the Defendant Property was engaged in perpetrating a Federal crime of terrorism, we need not reach this alternative theory.

## III

For the foregoing reasons, we affirm the district court's judgment.

*So ordered.*