# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 14, 2018     Decided September 13, 2019

No. 18-3017

UNITED STATES OF AMERICA,
APPELLANT

v.

JOSEPH RICKY PARK, ALSO KNOWN AS JOSEPH DEMASI,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cr-00009-1)

---

*Sonja M. Ralston*, Attorney, U.S. Department of Justice, argued the cause and filed the briefs for appellant. *Elizabeth Trosman*, Assistant U.S. Attorney, entered an appearance.

*A.J. Kramer*, Federal Public Defender, argued the cause and filed the brief for appellee. *Tony Axam Jr.* and *Celia Goetzl*, Assistant Federal Public Defenders, entered appearances.

Before: GARLAND, *Chief Judge*, and GRIFFITH and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Opinion concurring in part and concurring in the judgment by *Circuit Judge* GRIFFITH.

PILLARD, *Circuit Judge*: One hundred and seventy-six nations have come together to develop a coordinated, global approach to fight the sexual exploitation of children. Building on the United Nations Convention on the Rights of the Child, all but a handful of the nations of the world have agreed to the Optional Protocol on the Sale of Children, Child Prostitution and Child Pornography (Optional Protocol or Protocol). Its signatories jointly committed to take many common steps to protect children, including criminalizing various child sex offenses. Optional Protocol, art. 3. The Protocol also empowers its signatories to police their own nationals' sexual exploitation of children wherever it takes place. *Id.* art. 4. The United States Senate ratified the Protocol in 2002. Among the laws that fulfill the United States' duties under the Protocol is the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act, 18 U.S.C. § 2423 (2018) (PROTECT Act).

Defendant Joseph Ricky Park is a U.S. citizen with a prior conviction of a sex offense against a minor in the United States. Park now faces a PROTECT Act indictment for further sex crimes against a minor in Vietnam. He challenges Congress's constitutional authority to criminalize what he is alleged to have done in a foreign country.

Park was convicted in Connecticut of child sexual abuse decades ago. Since the 1990s, Park has for the most part been traveling and living abroad, including in Mexico, Cuba, South Korea, the Philippines, Thailand, Russia, Kuwait, China, Laos, Singapore, Malaysia, Saudi Arabia, Bahrain, Lebanon, Cambodia, and Vietnam. As Park traveled the world, he worked as an English teacher and, the government contends,

sexually abused children. He often moved from one country to the next once local law enforcement authorities suspected him of child sex abuse.

The United States apprehended Park in 2016 and indicted him for producing child pornography and sexually abusing a child while residing in Vietnam in 2015, in violation of the PROTECT Act, 18 U.S.C. §§ 2423(c), (e), (f)(3), (f)(1). Vietnam is a signatory to the Optional Protocol. Vietnam appears to have cooperated in Park's apprehension and raises no objection to the United States prosecuting him here on charges arising out of his conduct in Vietnam. Park successfully moved the district court to dismiss the indictment on the ground that Congress lacks constitutional authority for the application of a federal criminal prohibition to child sexual abuse and production of child pornography in a foreign country. The government appeals.

We hold that the PROTECT Act is constitutional as applied to Park. Each of the provisions that Park challenges is rationally related to implementing the Optional Protocol, a treaty of unchallenged validity to which the United States and Vietnam are signatories. The provisions of the PROTECT Act that criminalize child sexual abuse and production of child pornography by U.S. citizens living abroad help to fulfill the United States' responsibility under the Optional Protocol to criminalize, "as a minimum," child prostitution and child pornography production by U.S. nationals wherever that conduct occurs. Optional Protocol, arts. 3, 4. Congress's authority under the treaty to prosecute U.S. citizens' extraterritorial crimes involving sexual exploitation of children is bolstered by the Foreign Commerce Clause, which supports application of U.S. law to economic activity abroad that, in the aggregate, could otherwise impair the effectiveness of a

comprehensive regulatory regime to eliminate the sexual exploitation of children.

## I. BACKGROUND

### A. Factual Background

When reviewing the grant of a motion to dismiss an indictment, we accept the government's factual allegations as true. *See Boyce Motor Lines v. United States*, 342 U.S. 337, 343 & n.16 (1952); *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015). The government has provided additional information regarding Park's conduct in Vietnam and history of sexually abusing minors, and Park concedes that we appropriately assume the truth of that information as well. Appellee Br. 9-10.

Park has sexually abused minors in multiple countries over the past thirty years. In 1987, the State of Connecticut convicted Park of two counts of "Risk of Injury to a Child" and one count of "Sexual Assault 2nd Degree." Appendix for the United States (U.S. App.) 10; Park Appendix (Park App.) 24. After serving five years in prison, Park traveled to Mexico where, the United States alleges, he sexually abused children. Mexico extradited Park to the United States in 1995, and Connecticut re-imprisoned him until 1998 for violating the terms of his probation. In 2003, Park traveled from the United States to Cuba, where the Cuban government arrested and incarcerated him for nearly three years for "Corruption of a Minor." Park App. 24-25. Park again left the United States and, in 2009, South Korean authorities revoked his visa and ordered him to leave that country after they received information that he engaged in "indecent behavior" while working there as a schoolteacher. U.S. App. 11. In 2013, Park was apparently teaching English in Saudi Arabia when he was asked to leave because of his "pedophile" behavior. U.S. App.

14. Park went to Vietnam, where he remained on short-term tourist and business visas until November 2015.

The crimes for which the government now charges Park allegedly took place in 2015, while Park was working as an English teacher in Vietnam. The government alleges that Park introduced himself to an eleven-year-old Vietnamese boy (the alleged victim) at a park in Hanoi. Park told the boy he was an English language instructor and invited him to his apartment for lessons. Several weeks later, that same boy and two others visited Park at his apartment. The young friends and Park played a game that involved "chasing and grasping" each other, including on Park's bed. U.S. App. 12-13. The three boys then played videogames in Park's bedroom, with the victim sitting on Park's lap. Park began to "pinch" and stroke the boy's genitals through his clothing, telling the victim that he, Park, "wanted to make him feel good." *Id.* at 13. Park then tried to reach his hand inside the boy's pants, but the boy pushed Park's hand away.

The victim's mother reported Park's conduct to the United States Department of State, and Vietnam deported Park to Thailand. While in Thailand, Park asked a friend in Hanoi to collect various belongings from his apartment. The friend discovered child pornography on Park's computer and thumb drive and turned the evidence over to United States special agents. A forensic review later confirmed that the devices contained child pornography depicting unidentified victims in videos produced from July 2013 through August 2015.

In early 2016, Park left Thailand for Guam where a special agent for the United States Department of Homeland Security arrested him on January 15. A federal grand jury indicted Park, based on his conduct while residing in Vietnam, for violating 18 U.S.C. §§ 2423(c) and (e), which criminalize actual or

attempted "illicit sexual conduct with another person" engaged in by "[a]ny United States citizen . . . who travels in foreign commerce or resides, either temporarily or permanently, in a foreign country." Park moved for a bill of particulars, and the government specified that the charged "illicit sexual conduct" involved "the actual and attempted production of child pornography" and "an actual and attempted sexual act as defined in 18 U.S.C. Section 2246." *See* Gov't Resp. to Def.'s Bill of Particulars 2. The pornography charges are based only on images produced after May 30, 2015, which is when Congress amended the PROTECT Act to include production of child pornography.

## B. The Optional Protocol and the PROTECT Act

The Optional Protocol seeks to end the sexual exploitation of children by committing the countries of the world to eradicate child sex trafficking, child prostitution, and child pornography. The Protocol expresses "[d]eep[] concern[] at the widespread and continuing practice of sex tourism, to which children are especially vulnerable, as it directly promotes the sale of children, child prostitution and child pornography." Optional Protocol, preamble. Under article 3, paragraph 1, the parties to the Protocol (States Parties) have obligated themselves to criminalize, "as a minimum," acts of "[o]ffering, delivering or accepting . . . a child for the purpose of [s]exual exploitation of the child," "obtaining . . . a child for child prostitution," and "[p]roducing, distributing, disseminating, importing, exporting, offering, selling or possessing for the above purposes child pornography," whether those offenses are committed "domestically or transnationally or on an individual or organized basis." *Id.* art. 3(1). The Protocol further authorizes each State Party to exercise jurisdiction over persons who violate the article 3, paragraph 1 prohibitions "[w]hen the alleged offender is a national of that

State or a person who has his habitual residence in its territory." *Id.* art. 4(2)(a).

As noted, both the United States and Vietnam are signatories to the Optional Protocol, which was adopted and opened for signature in May 2000 and went into effect in January 2002. President Clinton signed the Protocol in July 2000. *See* Letter of Submittal from President Clinton to the Department of State, Protocols to the Convention on the Rights of the Child, S. Treaty Doc. No. 106-37, 2000 WL 33366017, at *1 (July 5, 2000) (Protocol Analysis). The President's letter transmitting the treaty to the Senate urged its consent because participation in the Protocol would "enhance the ability of the United States to provide global leadership in the effort to eliminate abuses against children" that involve "sexual exploitation." Letter of Transmittal from President Clinton to the Senate of the United States, Protocol Analysis at *1. The Senate consented to the ratification on June 18, 2002. *See* 148 Cong. Rec. S5717-01 (daily ed. June 18, 2002). Vietnam signed the Protocol in September 2000 and ratified it in December 2001.

The commercial sexual exploitation of children, which includes both child pornography and international child sex tourism, has grown rapidly over the past two decades into a multibillion-dollar industry. *See* Najat Maalla M'jid, *Report of the Special Rapporteur on the Sale of Children, Child Prostitution and Child Pornography*, U.N. Doc. A/HRC/22/54, at 9 (Dec. 24, 2012) (2012 U.N. Report); *see also United States v. Durham*, 902 F.3d 1180, 1195 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 849 (2019). Child sexual abuse images alone have been estimated to be worth about 20 billion dollars. 2012 U.N. Report at 9. And "[m]any developing countries have fallen prey to the serious problem of international sex tourism," yet, "for reasons ranging from ineffective law enforcement, lack of

resources, corruption, and generally immature legal systems, sex tourists often escape prosecution in the host countries." H.R. Rep. No. 107-525, at 2-3 (2002). Travelers seek out children to sexually abuse in a shifting subset of countries where they anticipate lax law enforcement: "As child protection laws, mechanisms and prevention efforts are strengthened by States, civil society and the tourism industry in some countries, neighboring countries become obvious alternative destinations for travelling sex offenders." 2012 U.N. Report at 5. Affected countries often "reach out to the United States for help," and "some even blame the United States for the problem, arguing that many of the sex tourists are American." H.R. Rep. No. 107-525, at 3. For this reason, people around the world have historically looked to the United States to take responsibility to put an end to sex offenders' abuse of children overseas. *Id*.

Congress proposed the Sex Tourism Prohibition Improvement Act of 2002 to address "this growing problem." *Id*. The House Judiciary Committee reported on the proposed bill and recommended it for passage just six days after the Senate consented to the ratification of the Optional Protocol. *Id.* at 1. Renamed the PROTECT Act, the bill was signed into law a year later. Pub. L. No. 108-21, 117 Stat. 650 (2003); *see generally United States v. Bollinger*, 798 F.3d 201, 208 (4th Cir. 2015). The PROTECT Act amended an existing, narrower federal criminal bar against travel undertaken with the *intent* to commit illicit sexual conduct. *See* 18 U.S.C. § 2423(b) (2000). In light of experience showing that it was difficult to prove that travel was undertaken with the requisite intent, the new statute included a provision reaching sex crimes committed by U.S. citizens abroad without regard for the initial purpose of the international travel. *See* H.R. Rep. 107-525, at 3; 148 Cong. Rec. H3885 (daily ed. June 25, 2002) (statement of Rep. Sensenbrenner, co-sponsor).

Passage of the PROTECT Act did not eliminate misgivings about the adequacy of the United States' implementation of the Protocol. The United Nations, for instance, repeatedly expressed its "concern" that the United States' extraterritorial jurisdiction "did not reach all offenses covered by the Optional Protocol" and urged the United States to "establish its jurisdiction in all cases listed under article 4 of the Optional Protocol," which calls on parties to assume jurisdiction over their nationals for all article 3, paragraph 1 offenses (which, as noted above, include sexual exploitation and child pornography). Comm. on the Rights of the Child, *Concluding Observations on the Second Periodic Report of the United States of America Submitted Under Article 12 of the Optional Protocol to the Convention on the Sale of Children, Child Prostitution and Child Pornography*, ¶¶ 39-40, U.N. Doc. CRC/C/OPSC/USA/CO/2 (July 2, 2013) (2013 Concluding Observations); Comm. on the Rights of the Child, *Consideration of Reports Submitted by States Parties Under Article 12, Paragraph 1, of the Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution and Child Pornography*, ¶¶ 35-36, U.N. Doc. CRC/C/OPSC/USA/CO/1 (June 25, 2008) (2008 Consideration of Reports). U.S. courts also expressed concern that the PROTECT Act's prohibition on "travel[ing] in foreign commerce[] and engag[ing] in any illicit sexual conduct," 18 U.S.C. § 2423(c) (2006), might not reach U.S. citizens who had settled abroad. *See, e.g.*, *United States v. Schmidt*, 845 F.3d 153, 156-58 (4th Cir. 2017); *United States v. Jackson*, 480 F.3d 1014, 1022-1024 (9th Cir. 2007).

Meanwhile, it had become apparent that "known child-sex offenders [were] traveling internationally." International Megan's Law to Prevent Child Exploitation and Other Sexual Crimes Through Advanced Notification of Traveling Sex Offenders, Pub. L. No. 114-119, § 2(4), 130 Stat. 15, 15 (2016)

(International Megan's Law). Before 2016, the federal Sex Offender Registration and Notification Act (SORNA), 42 U.S.C. § 16901 *et seq.*, did not require sex offenders to update their location information in the sex offender registry system when they traveled or moved abroad, and sex offenders took advantage of that loophole by relocating to foreign countries without giving notice to federal authorities. *See, e.g.*, *Nichols v. United States*, 136 S. Ct. 1113, 1118 (2016); *United States v. Lunsford*, 725 F.3d 859, 861-62 (8th Cir. 2013). Offenders gravitated to certain developing countries, such as the Philippines, which were known to have "significant problems with sex tourism." H.R. Rep. No. 107-525, at 3.

Congress responded to these concerns by amending section 2423(c) in 2013 to reach illicit sexual conduct by U.S. citizens and permanent residents who "reside[], either temporarily or permanently, in a foreign country." Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, Title XII, § 1211(b), 127 Stat. 54, 142 (2013). And, in May 2015, Congress added "production of child pornography" to the definition of "illicit sexual conduct" in section 2423(f). Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, Title I, § 111(a)(3), 129 Stat. 227, 240 (2015).

In relevant part, the PROTECT Act now reads:

> (c) Engaging in illicit sexual conduct in foreign places.—Any United States citizen or alien admitted for permanent residence who . . . resides, either temporarily or permanently, in a foreign country, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.
>
> . . .

(e) Attempt and conspiracy.—Whoever attempts or conspires to violate subsection . . . (c) . . . shall be punishable in the same manner as a completed violation of that subsection.

(f) Definition.—As used in this section, the term "illicit sexual conduct" means—

> (1) a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States;
>
> . . .
>
> (3) production of child pornography (as defined in section 2256(8)).

18 U.S.C. § 2423.  As relevant here, section 2246 defines the term "sexual act" to include the "intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person."  *Id*. § 2246(2)(D).

Park's is one of the first prosecutions brought under either the new "resides" language in section 2423(c), added in 2013, or the child-pornography production language in section 2423(f), added in 2015.

## C.  The Decision of the District Court

The district court dismissed the indictment on February 28, 2018, on the ground that the Foreign Commerce Clause, the

treaty power, and Congress's inherent, plenary powers over foreign affairs all failed to authorize the application of 18 U.S.C. § 2423(c) to the conduct for which Park was indicted. *United States v. Park*, 297 F. Supp. 3d 170, 174-83 (D.D.C. 2018).

The district court held that Congress's treaty power did not support section 2423(c) on the facts of this case. The court doubted the PROTECT Act implemented the Optional Protocol because the Act's legislative history was "devoid" of any indication that Congress acted with such a purpose. *Id.* at 180. Even if Congress enacted section 2423(c) to implement the Protocol, the court viewed the statute, as applied to Park's non-commercial conduct, as not rationally related to the "single goal of the Optional Protocol," which was, according to the court, "to address the States Parties' grave concerns regarding the '*international traffic* of children.'" *Id.* (emphasis in original) (quoting Optional Protocol, preamble). The court also concluded that the Foreign Commerce Clause did not authorize Congress to reach Park's conduct. Applying to the foreign commerce power the three-part Interstate Commerce Clause framework established in *United States v. Lopez*, 514 U.S. 549 (1995), the court held that it could not sustain the Act's application here under any part. *Park*, 297 F. Supp. 3d at 174-79. Finally, because of "the absence of case law supporting the government's position" on the point, the court declined to hold that "Congress has plenary powers over citizens and foreign affairs that empower it to act" beyond the scope of an enumerated constitutional power. *Id.* at 183.

## II. ANALYSIS

The government argues on appeal that Congress's treaty power and the Foreign Commerce Clause support the application of 18 U.S.C. § 2423 to Park's conduct in Vietnam. Accordingly, we must determine whether the PROTECT Act, as applied to Park, is a "necessary and proper means to" implement the Optional Protocol, *Missouri v. Holland*, 252 U.S. 416, 432 (1920), or whether it falls within the scope of Congress's foreign commerce powers. Our review is de novo. *See Hodge v. Talkin*, 799 F.3d 1145, 1155 (D.C. Cir. 2015); *McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 488 (D.C. Cir. 2008).

We start from the premise that "the 'question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 570 (2012) (quoting *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948)). A court must be able to discern a basis for Congress's exercise of an enumerated power, but that does not mean that a "law must be struck down because Congress used the wrong labels" or failed to identify the source of its power. *Id.* at 569-70. As a practical matter, congressional findings may help a court to understand a statute's operation, such as by explaining its connection to commerce. *Gonzales v. Raich*, 545 U.S. 1, 20-21 (2005). But so long as there is no ground for heightened judicial scrutiny of its action—none is asserted here—Congress need not make "particularized findings in order to legislate." *Id.* at 21 (distinguishing *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 664-68 (1994)).

Congress's power to legislate may also stem from more than one enumerated power. *See United States v. Morrison*, 529 U.S. 598, 607 (2000) (noting that "[e]very law enacted by

Congress must be based on one or more of its powers enumerated in the Constitution"); *see also United States v. Lara*, 541 U.S. 193, 200-01 (2004) (noting that Congress's "plenary and exclusive" power to legislate with respect to Indian tribes derives from both the Indian Commerce Clause and the power to implement treaties); *Legal Tender Cases*, 79 U.S. (12 Wall) 457, 534 (1870) (noting that it is "allowable to group together any number of [the specified constitutional powers] and infer from them all that the power claimed has been conferred"); *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407 (1819) (noting that several of Congress's powers support creation of a national bank).  Where, as here, Congress's treaty and Commerce Clause powers dovetail, both powers may provide support for the constitutionality of Congress's actions, *see Lara*, 541 U.S. at 200-02, which in our view makes it appropriate to examine all potential sources, *but see* Concurring Op., *infra*.

**A.  Congress's treaty power reaches Park's conduct.**

Article II of the Constitution empowers the President to make treaties with the advice and consent of the Senate.  U.S. Const. art. II, § 2, cl. 2.  The Necessary and Proper Clause, U.S. Const. art I, § 8, cl. 18, in turn, confers on Congress the "power to enact such legislation as is appropriate to give efficacy to . . . treat[ies]" made by the President with the advice and consent of the Senate.  *Neely v. Henkel*, 180 U.S. 109, 121 (1901).  In Justice Holmes's memorable formulation, "[i]f the treaty is valid there can be no dispute about the validity of the statute under Article 1, Section 8, as a necessary and proper means to execute the powers of the Government."  *Holland*, 252 U.S. at 432.  Congress's power to enact legislation it deems necessary and proper to implement a valid treaty is commonly referred to as the "treaty power."  *Lara*, 541 U.S. at 201.

"[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *United States v. Comstock*, 560 U.S. 126, 134 (2010) (citing *Sabri v. United States*, 541 U.S. 600, 605 (2004)).  The inquiry is "simply 'whether the means chosen are "reasonably adapted" to the attainment of a legitimate end.'"  *Id.* at 135 (quoting *Raich*, 545 U.S. at 35 (Scalia, J., concurring in judgment)).  In this case, the "legitimate end" is implementation of the Optional Protocol.  If it is apparent that the means Congress has chosen are "convenient, or useful, or conducive" to effectuate a valid treaty, *id.* at 134-35 (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 413), then "the degree of their necessity, the extent to which they conduce to the end, the closeness of the relationship between the means adopted and the end to be attained, are matters for congressional determination alone," *id*. at 135 (quoting *Burroughs v. United States*, 290 U.S. 534, 548 (1934)).

Accordingly, to determine whether the challenged provisions as applied to Park are within the scope of federal authority, we consider whether they are rationally related to implementing the Optional Protocol's goals.  These goals include not only, as the district court observed, 297 F. Supp. 3d at 180, combating the "international traffic of children," but also "eliminat[ing] . . . child prostitution and child pornography," and addressing international "sex tourism," Optional Protocol, preamble.  Because the government charged Park with only one count, which encompasses both Park's child pornography production and child sex abuse, the indictment stands so long as Congress had the authority to reach either type of conduct.  We hold that both applications are constitutionally valid exercises of Congress's treaty power.

Each of the provisions under which he is charged—criminalizing production of child pornography by a U.S. citizen residing abroad, 18 U.S.C. §§ 2423(c), (f)(3), and non-commercial child sexual abuse by a U.S. citizen residing abroad, *id.* §§ 2423(c), (f)(1)—helps to eradicate the sexual exploitation of children that the Optional Protocol targets. Each provision is therefore rationally related to fulfilling the United States' obligations under the treaty.

**1. The PROTECT Act's prohibition against United States citizens producing child pornography while residing abroad is rationally related to implementing the Optional Protocol.**

The PROTECT Act's prohibition against U.S. citizens producing child pornography while residing abroad rationally relates to two aspects of the Optional Protocol. First, the Optional Protocol requires the States Parties to criminalize the production of child pornography. Second, it empowers them to exercise jurisdiction over the pertinent offenses of their nationals regardless of where the offenses occur. The Protocol thus constitutionally supports indictment of Park, a U.S. citizen, for producing child pornography in Vietnam.

The Optional Protocol directs the States Parties to criminalize the production of child pornography. Each State Party "shall prohibit . . . child pornography as provided for by the present Protocol," Optional Protocol, art. 1, including specifically prohibiting the "[p]roducing, distributing, disseminating, importing, exporting, offering, selling or possessing for the above purposes child pornography," *id.* art. 3(1)(c). By criminalizing the "production of child pornography" by U.S. citizens abroad, 18 U.S.C. § 2423(f)(3), the PROTECT Act is rationally related to implementing the Optional Protocol.

Park objects that the Optional Protocol is concerned only with commercial child pornography, so the PROTECT Act's ban on child pornography homemade for one's own use, not bought or sold—*i.e.*, the type of conduct alleged against Park— is not rationally related to the implementation of the Protocol. The Protocol is not so confined. It calls on States Parties to prohibit the production of child pornography without limitation to any proven commercial conduct or plans.

"When interpreting a treaty, we begin with the text of the treaty and the context in which the written words are used," applying all "general rules of construction" to aid our understanding. *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 535 (1991) (internal quotation marks and citation omitted). The preamble to the Optional Protocol states an ultimate goal of "elimination of . . . child pornography," without limitation to commercially traded images, such that even non-commercial production falls within its scope. Optional Protocol, preamble. The Optional Protocol also capaciously defines "child pornography" as "any representation, by whatever means, of a child engaged in real or simulated explicit sexual activities or any representation of the sexual parts." *Id.* art. 2(c).

The States Parties chose not to limit the Optional Protocol to commercial child pornography production for obvious reasons. As a practical matter, the line between possession of and trade in pornographic images is exceedingly fine and fragile. "[C]hild pornography is now traded with ease on the Internet" and, in the digital age, "the number of still images and videos memorializing the sexual assault and other sexual exploitation of children, many very young in age, has grown exponentially." *Paroline v. United States*, 572 U.S. 434, 440 (2014) (quoting Patti B. Saris et al., U.S. Sentencing Comm'n, *Federal Child Pornography Offenses* 3 (2012)). Child pornography stored online can be distributed worldwide almost

instantaneously. *United States v. Sullivan*, 451 F.3d 884, 891 (D.C. Cir. 2006).

Commercial transactions in child pornography can be difficult if not impossible to establish where no traceable payment means is used. Child pornography producers have strong incentives to barter their images, leaving no monetary transaction record. Indeed, online child-pornography groups often require people seeking to join to upload new images in order to gain access to images already contributed by existing members. Regardless of whether child pornography is created with any commercial purpose, production of digital pornographic images of children expands the stock of such images worldwide. The ease with which they may be converted to commercial use means that, if left unregulated, non-commercial production of such images could substantially hinder efforts to eliminate the international child pornography market. Once an image is uploaded, each new transfer "multipl[ies] the existing supply of the commodity, so that even if the initial possessor's holdings are destroyed, subsequent possessors may further propagate the images." *Id.* Criminalizing production only where there is proof of a monetary transaction or commercial purpose would be a mere half measure toward halting the supply of child pornography available to the illegal market, and so fall short in serving one of the primary purposes of the treaty: "the elimination . . . of child pornography." Optional Protocol, preamble.

That the treaty requires the criminalization of "[p]roducing, distributing, disseminating, importing, exporting, offering, selling or possessing *for the above purposes* child pornography," *id.* art. 3(1)(c) (emphasis added), does not, as Park suggests, limit its terms to child pornography produced for commercial distribution. He reads the phrase "for the above purposes" as confined to either the other "purposes"

expressly identified in Article 3—"sexual exploitation of the child," "transfer of organs of the child for profit," or "engagement of the child in forced labor," *id.* art. 3(1)(a)(i)— or the general activities listed in subsections (a) and (b) of Article 3—the sale of children and child prostitution, *id.* art. 3(1)(a), (b). However, we typically apply the "rule of the last antecedent" when interpreting a text that "include[s] a list of terms or phrases followed by a limiting clause." *Lockhart v. United States*, 136 S. Ct. 958, 962 (2016). Thus, "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). As used here, the phrase "for the above purposes" modifies only the last antecedent, "possessing," and references the listed purposes of "producing, distributing, disseminating, importing, exporting, offering, [and] selling" child pornography. UNICEF adopts this reading, in fact recognizing it as the one most protective of potential offenders: "Interpreted strictly, article 3(1)(c) of the [Protocol] obliges States Parties to punish the possession of child pornography only when this possession is 'for the above purposes'—producing, distributing, disseminating, importing, exporting, offering or selling." UNICEF, *Handbook on the Optional Protocol on the Sale of Children, Child Prostitution, and Child Pornography* 12 (2009); *see also id.* (noting that the "Committee on the Rights of the Child has nevertheless encouraged countries to prohibit simple possession"). Given its narrow scope, the phrase "for the above purposes" in no way limits to commercial production the Protocol's prohibition against "producing" child pornography.

Because the Optional Protocol, by its terms, reaches both commercial and non-commercial production of child pornography, the PROTECT Act's criminalization of non-commercial child pornography production plainly implements the treaty and is constitutional as applied to Park.

Congress's decision to apply the PROTECT Act to Americans who "reside[], either temporarily or permanently, in a foreign country," 18 U.S.C. § 2423(c), similarly fulfills the Optional Protocol's expectation that States Parties will take jurisdiction over the misdeeds of their nationals wherever they occur.

The Optional Protocol reflects agreement that each State Party "may take such measures as may be necessary to establish its jurisdiction" over offenses "[w]hen the alleged offender is a national of that State." Optional Protocol, art. 4(2). This type of jurisdiction, where a country prescribes law with respect to the "conduct, interests, status, and relations of its nationals and residents outside its territory," is known as "active personality jurisdiction" or "nationality jurisdiction." Restatement (Fourth) of Foreign Relations Law of the United States, § 402(1)(c), cmt. g & rep. note 7 (Am. Law Inst. 2018). Under international law, every nation has "jurisdiction over its subjects travelling or residing abroad, since they remain under its personal supremacy," and the United States is no exception. *Blackmer v. United States*, 284 U.S. 421, 437 n.2 (1932) (quoting L. Oppenheim, 1 *International Law* 281 (4th ed. 1926)). Congress retains authority over U.S. citizens residing abroad "[b]y virtue of the obligations of citizenship." *Id.* at 436; *accord United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936).

When the United States originally ratified the Protocol, however, it chose not to exercise its nationality jurisdiction over its citizens' conduct abroad. *See* Protocol Analysis at *23. The United Nations twice criticized the United States for that reticence, stressing that the United States must "establish its jurisdiction in all cases listed under article 4" of the Optional Protocol in order to "strengthen the framework for prosecution and punishment." 2013 Concluding Observations ¶¶ 39-40;

2008 Consideration of Reports ¶¶ 35-36. Congress could have rationally concluded that, to fully implement the United States' obligations under the Protocol, it needed to respond to international opprobrium by expanding the coverage of section 2423(c) to criminalize child pornography produced by U.S. citizens residing abroad. Indeed, in 2016, the United States cited the revised version of section 2423(c), reaching offenses by U.S. citizens residing abroad, as evidence of its continuing efforts to fulfill its responsibilities under the Optional Protocol. *See* Dep't of State, *Combined Third and Fourth Periodic Report of the United States of America on the Optional Protocols to the Convention on the Rights of the Child on the Involvement of Children in Armed Conflict and the Sale of Children, Child Prostitution, and Child Pornography*, ¶ C-57 (Jan. 22, 2016).

Park objects that the PROTECT Act does not implement the Optional Protocol because, in his view, the "Protocol 'does not require the United States to criminalize the production of child pornography in *another* country.'" Appellee Br. 50 (quoting *Park*, 297 F. Supp. 3d at 181) (emphasis in *Park*). He contends that the Optional Protocol addresses only child pornography produced domestically within the United States or produced "transnationally," which he somewhat awkwardly reads to mean "between the United States and another nation." *Id.* at 45 (quoting Optional Protocol art. 3(1)). But "transnationally" is often used to mean simply "reaching beyond national boundaries," *see, e.g.*, Philip Jessup, *Transnational Law* 2 (1956) (defining "transnational law" to "include all law which regulates actions or events that transcend national frontiers"); *Transnational*, Black's Law Dictionary (2019) (defining "transnational" as "[i]nvolving more than one country"). The Protocol's coverage of both domestic and transnational offenses is naturally read as exhaustive, encompassing, for example, both what a citizen of

one country does within his own country and what he does abroad. Indeed, this reading accords with the view of the United Nations itself, which has observed that "[e]xtraterritorial legislation is one of the key tools in combating [child sex tourism], as it allows legal authorities to hold nationals and citizens accountable for crimes committed abroad." 2012 U.N. Report at 11. The full text of the sentence Park quotes shows an intent to sweep broadly. In requiring States Parties to criminalize the specified conduct whether it is "committed domestically or transnationally or on an individual or organized basis," Optional Protocol, art. 3(1), the treaty calls for bans on that conduct no matter where it is committed, or by one person or many. The PROTECT Act's prohibition on the production of child pornography by U.S. citizens abroad is rationally related to the implementation of this final clause.

Moreover, it is unlikely that the States Parties intended Park's crabbed and ineffectual reading, which would criminalize domestic and "transnational" activity but not the acts of U.S. citizens within foreign countries. A "treaty is a contract . . . between nations," and its "interpretation normally is, like a contract's interpretation, a matter of determining the parties' intent." *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014). Here, the text itself encourages the States Parties to go further than its bare terms. The same sentence on which Park relies also states that "[e]ach State Party shall ensure that, *as a minimum*" the conduct described is criminalized. Optional Protocol, art. 3(1). The preamble to the Optional Protocol further recognizes that "the elimination of the sale of children, child prostitution and child pornography" would require "a holistic approach." *Id.*, preamble. Where the text of a treaty "create[s] a floor, not a ceiling" in this manner, Congress may properly implement the treaty's intent by going further in its implementing legislation. *United States v. Belfast*, 611 F.3d 783, 807 (11th Cir. 2010). Accordingly, the

"extraterritorial application" of the PROTECT Act, 18 U.S.C. § 2423(c), to Park's conduct while he was residing abroad is expressly permitted by the Optional Protocol.

**2. The PROTECT Act's prohibition of child sexual abuse by United States citizens residing abroad is rationally related to implementing the Optional Protocol.**

The Optional Protocol prohibits the "[o]ffering, obtaining, procuring or providing a child for child prostitution," Optional Protocol art. 3(1)(b), and defines "child prostitution" as "the use of a child in sexual activities for remuneration or any other form of consideration," *id.* art. 2(b). As such, the Protocol does not itself specifically address non-commercial child sexual abuse. Nevertheless, the PROTECT Act's broader prohibition on child sex abuse by U.S. citizens residing abroad, including non-commercial crimes, 18 U.S.C. §§ 2424(c), (f)(1), was appropriate to combat commercial child sex tourism and control the problem of American sex offenders relocating and sexually abusing children abroad, thereby closing enforcement gaps that otherwise could have hindered the objectives of the Optional Protocol.

The Necessary and Proper Clause empowers Congress to fill "regulatory gaps" that could otherwise be left by its exercise of constitutionally enumerated legislative powers. *Sabri v. United States*, 541 U.S. 600, 607 (2004); *see United States v. Kebodeaux*, 570 U.S. 387, 395 (2013). Here, the Optional Protocol's goal of eliminating commercial child sexual exploitation, including global sex tourism, could be undercut if Congress failed to criminalize non-commercial child sex abuse by U.S. residents abroad. This is so for at least three reasons.

First, as a general matter, such a "loophole in the law" could encourage American sex tourists—who by some

estimates comprise one quarter of all sex tourists globally—to go abroad seeking *non*-commercial sex with minors that, had it occurred in the United States, would be criminalized as statutory rape. "If Americans believe that traveling to a particular foreign country includes the opportunity for unregulated, non-commercial illicit sexual conduct, they may travel to that country when they otherwise would not . . . ." *United States v. Lindsay*, 931 F.3d 852, 863 (9th Cir. 2019); *see also United States v. Pendleton*, 658 F.3d 299, 311 (3d Cir. 2011). The "Constitution does not envision or condone" such "a vacuum" of power in which "citizens may commit acts abroad that would clearly be crimes if committed at home." *Bollinger*, 798 F.3d at 219.

Second, and relatedly, Congress might well have concluded that the PROTECT Act's prohibition of non-commercial sexual exploitation of minors by U.S. residents abroad was appropriate to ameliorate a specific externality of the United States' intensified domestic policing of child sexual abuse: the relocation to other countries of registered U.S. sex offenders and the risks such offenders may pose there. Until 2016, SORNA did not require registered sex offenders in the United States to update their sex offender registrations when they moved abroad. *See, e.g.*, *Nichols*, 136 S. Ct. at 1118. Consequently, "known child-sex offenders [were] traveling internationally," International Megan's Law § 2, and some relocated abroad to get out from under SORNA's registration requirements, *see, e.g.*, *Nichols*, 136 S. Ct. at 1117-18; *Lunsford*, 725 F.3d at 861-62. (After the events at issue here, Congress took further steps to address this externality, amending the law to require registered U.S. sex offenders to update their SORNA registrations when they plan to travel outside the United States, *see* 34 U.S.C. § 20914(a)(7); 18 U.S.C. § 2250(b).) When domestic legislation creates or exacerbates identified risks to treaty partners—*e.g.* when

domestic counter-recidivism measures like SORNA lead U.S.-citizen sex offenders to move overseas and commit the very crimes the Protocol aims to eliminate—Congress's treaty power authorizes it to address that danger.

Third, Congress rationally could have concluded that the Optional Protocol's goal of eliminating global sex tourism involving minors would be undermined unless putatively non-commercial sex with minors were also criminalized. Congress was well aware that the *quid-pro-quo* in child prostitution is typically more indirect or hidden than for prostitution involving adults. If a U.S. national could travel overseas and entice a child with inchoate favors, valuable experiences, promised future benefits, meals, or other gifts—any of which might be difficult to establish as "consideration" in support of a child prostitution charge—deterrents against traveling internationally to sexually abuse children would be significantly weakened. The statutory prohibition against non-commercial child sex abuse is therefore a "vital component" in the "PROTECT Act's larger scheme" to "curb the supply and demand in the sex tourism industry." *Durham*, 902 F.3d at 1214.

Congress's power to give the treaty practical effect against conduct like Park's is not confined to the Optional Protocol's minimum requirements. Again, the Protocol identifies the child sexual exploitation it targets and specifies "a floor, not a ceiling" on how signatories should address such exploitation by their nationals abroad. *See Belfast*, 611 F.3d at 807; *United States v. Lue*, 134 F.3d 79, 84 (2d Cir. 1998). The States Parties to the Optional Protocol recognized that the "elimination of . . . child prostitution" would require national lawmakers to take "a holistic approach, addressing the contributing factors," including "irresponsible adult sexual behaviour." Optional Protocol, preamble. The treaty therefore stipulates that

criminalizing the conduct it identifies is "only a 'minimum' requirement." *Bollinger*, 798 F.3d at 219 (quoting Optional Protocol art. 3). In view of the Protocol's purpose and scope, it was reasonable for Congress in enacting the PROTECT Act "to determine that the non-commercial abuse of children is a factor that contributes to commercial sexual exploitation, and to regulate non-commercial conduct accordingly." *Id.* And it was therefore constitutional for Congress to reach Park's alleged conduct in this case.

Our conclusions regarding the treaty power comport with the fundamental constitutional principle that Congress may legislate only within the scope of its constitutionally conferred powers. The government may not simply point to any tangentially related treaty to defend a constitutionally suspect statute. There are at least two recognized limits to what Congress may legislate in the name of implementing a treaty. First, to be a valid exercise of the Necessary and Proper Clause, the treaty itself must be "legitimate," and the statute must be "plainly adapted to" the treaty. *McCulloch*, 17 U.S. (4 Wheat.) at 421. Second, implementing legislation must be both "not prohibited" by the Constitution and "consistent with the letter and spirit of the Constitution." *Id.* It is "well established that 'no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution.'" *Boos v. Barry*, 485 U.S. 312, 324 (1988) (quoting *Reid v. Covert*, 354 U.S. 1, 16 (1957)). Though this inquiry is deferential, it is not toothless. Here, the PROTECT Act is plainly necessary and proper to implement the goals of the Optional Protocol.

Park argues for an additional limit. He claims that we must first assess "whether a statute is in fact implementing legislation," and argues that "§ 2423(c), originally and as amended, contains no indication that it is implementing the

Protocol." Appellee Br. 38. To the extent any such nexus is required—and Park provides no support for this proposition—we find it satisfied here. The House Judiciary Committee recommended passage of what became the PROTECT Act just six days after the Senate ratified the Optional Protocol. And, as discussed, Congress passed later amendments to the PROTECT Act to address loopholes in the international regulatory scheme.

In addition, Park passingly suggests that Congress's treaty power is confined to helping the President make treaties, and that "[o]nce a treaty has been made, Congress's power to do what is 'necessary and proper' to assist the making of treaties drops out of the picture." *Id.* at 37 (quoting *Bond v. United States*, 572 U.S. 844, 876 (2014) (Scalia, J., concurring in the judgment)). According to that view, Congress "must rely upon its independent . . . Article I, § 8, powers" in order to "legislate compliance with the United States' treaty obligations." *Bond*, 572 U.S. at 876. But under *Missouri v. Holland*, 252 U.S. at 433-34, that is not the law. Under long established treaty power doctrine, the PROTECT Act is constitutional as applied to Park's conduct abroad.

## B. Congress's power under the Foreign Commerce Clause further supports application of the PROTECT Act to Park.

Although Congress's treaty power suffices to support the constitutionality of the PROTECT Act's application to Park, the Foreign Commerce Clause provides further constitutional authority to criminalize Park's child pornography production and non-commercial child sex abuse abroad. *Cf. Lara*, 541 U.S. at 200 (resting Congress's "plenary and exclusive" power to legislate with respect to Indian tribes on both the treaty power and the Indian Commerce Clause).

Article I of the Constitution empowers Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. Because the Foreign Commerce Clause appears alongside the Interstate Commerce Clause, courts have generally applied some version of the Supreme Court's Interstate Commerce Clause analytic framework to Foreign Commerce Clause cases. *In re Sealed Case*, No. 14-3043, 2019 WL 4123971, at *6 (D.C. Cir. June 25, 2019); *cf. Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 74 (1824) (noting that the word "commerce" "must carry the same meaning throughout the sentence, and remain a unit, unless there be some plain intelligible cause which alters it"). Under that framework, Congress may regulate "three broad categories of activity." *Lopez*, 514 U.S. at 558. First, Congress may regulate the "use of the channels of interstate commerce." *Id.* Second, Congress may regulate the "instrumentalities of interstate commerce, or persons or things in interstate commerce." *Id.* Finally, and most relevant here, Congress may regulate "those activities . . . that substantially affect interstate commerce," *id.* at 558-59, so long as the regulated activity is "some sort of economic endeavor," *Morrison*, 529 U.S. at 611.

With respect to the final category, the Court has clarified that Congress may also "regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale," if Congress "concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Raich*, 545 U.S. at 18. A reviewing court "need not determine whether [challengers'] activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Id*. at 22. For this reason, the Court in *Raich* sustained the application of federal criminal law to local, non-commercial production and use of marijuana where Congress had grounds

to conclude that failure to do so would leave a "gaping hole" in a comprehensive drug-regulation statute. *Id*.; *see also Wickard v. Filburn*, 317 U.S. 111, 125 (1942) (holding that "even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial effect on interstate commerce").

We also adapt the Interstate Commerce Clause framework, and turn to the preliminary question of whether Congress's foreign commerce power is broader, narrower, or coextensive with its interstate commerce power. Park reads relative restriction in the Foreign Commerce Clause's grant of power "to regulate Commerce *with* foreign Nations," in contrast to the domestic clause's reference to regulation of commerce "*among* the several States." U.S. Const. art. I, § 8, cl. 3 (emphases added); *see also United States v. Al-Maliki*, 787 F.3d 784, 793 (6th Cir. 2015) (expressing "skeptic[ism]" that "Congress has greater commerce power over conduct occurring in foreign countries than conduct occurring in the States").

We disagree with Park's reading of the Foreign Commerce Clause as narrower than its domestic counterpart. Indeed, the point was implicitly rejected by the Supreme Court when it recognized that Congress's foreign commerce powers are, at least in some ways, broader than Congress's interstate commerce powers. The Court has noted that "there is evidence that the Founders intended the scope of the foreign commerce power to be [] greater" than its interstate counterpart, *Japan Line, Ltd. v. Los Angeles Cty.*, 441 U.S. 434, 448 & n.13 (1979), and that Congress's commerce power "when exercised in respect of foreign commerce may be broader than when exercised as to interstate commerce," *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 434 (1932).

More explicitly, the Supreme Court has held that the Indian Commerce Clause, which also uses the preposition "with" in authorizing Congress to "regulate Commerce . . . *with* the Indian Tribes," U.S. Const. art. I, § 8, cl. 3 (emphasis added), confers on Congress "plenary power to legislate in the field of Indian affairs," *Lara*, 541 U.S. at 200 (quoting *Cotton Petroleum v. New Mexico*, 490 U.S. 163, 192 (1989)). The Court has characterized the foreign commerce power as at least equally broad. *See Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904) (declaring that the "power to regulate foreign commerce is certainly as efficacious as that to regulate commerce with the Indian tribes").

These conclusions make good sense. In foreign commerce, the federalism constraints that limit Congress's interstate commerce power are absent, and there is a greater need for the United States to speak with a single voice. *See, e.g.*, *Japan Line*, 441 U.S. at 448 (quoting *Bd. of Trs. v. United States*, 289 U.S. 48, 59 (1933)). Unencumbered by federalism limitations, Congress acts with the full regulatory power of a nation-state when it legislates regarding its "commerce" with foreign nations. Therefore, we follow our sister circuits in adopting an "effects test" that is at least as expansive as the test employed in the Interstate Commerce Clause context. *See Sealed Case*, 2019 WL 4123971, at *6; *see also, e.g.*, *United States v. Durham*, 902 F.3d 1180, 1192-93 (10th Cir. 2018) ("substantial effect"); *Pendleton*, 658 F.3d at 308 ("substantial effect"); *United States v. Baston*, 818 F.3d 651, 668 (11th Cir. 2016) ("substantial effect"); *Bollinger*, 798 F.3d at 215-16 ("demonstrabl[e] [e]ffect[]"). We once again find it unnecessary to "define today the precise level of 'effect' necessary," because the alleged facts taken as true place Park's conduct abroad "within Congress's reach under any version of the test." *Sealed Case*, 2019 WL 4123971, at *6. We hold that the Foreign Commerce Clause provides constitutional support

for the challenged indictment of Park for violating the PROTECT Act.

**1. The PROTECT Act's prohibition against United States citizens producing child pornography while residing abroad is a valid exercise of Congress's foreign commerce power.**

Criminalizing the non-commercial production of child pornography that affects international commerce is a straightforward application of *Raich* and *Wickard*. The market effect that supported federal regulation in those cases was the risk that "production of the commodity meant for home consumption" could be drawn into the commercial market as a result of high demand. *Raich*, 545 U.S. at 19. The same type of market effect supports the PROTECT Act's application to non-commercial child pornography. Both commercial and non-commercial production may rationally be viewed as "quintessentially economic" activity, involving the making at home of a product that presumably would otherwise be procured in an established illegal market. *Sullivan*, 451 F.3d at 890-91 (quoting *Raich*, 545 U.S. at 18). It is reasonable to conclude that criminalizing the production and possession of child pornography "increases the 'price' of pornography by attaching the risk of prosecution, a market intervention meant to eliminate the illicit trade." *Sullivan*, 451 F.3d at 891. Eliminating child pornography is also a reasonable means to advance Congress's comprehensive scheme to "eliminate the market for the sexual exploitative use of children," because child sex abusers and traffickers often use child pornography to "seduc[e] other children into sexual activity." Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, § 121(12), (3), 110 Stat. 3009, 3009-26, 3000-27 (1996).

Indeed, for some of the same reasons addressed in Part II.A.1, the effect of non-commercial production of child pornography on the market for child-pornographic images may be even greater than the market effects of the commodities at issue in *Raich* and *Wickard*. "The Internet, and its capacity to facilitate online bartering of computer files between collectors and purveyors of child pornography, readily links a single computer user to a possible network of others." *United States v. Dyer*, 589 F.3d 520, 530 (1st Cir. 2009). Pornography initially produced purely for personal viewing can be used as intended and also diverted into the market. That is because, "[i]n contrast to wheat or marijuana, the supply of electronic images of child pornography has a viral character: every time one user downloads an image, he simultaneously produces a duplicate version of that image" meaning that "each new possessor increases the available supply of pornographic images." *Sullivan*, 451 F.3d at 891. This multiplying effect "highlights the importance of eliminating a possessor's stash in the first instance, before it can be disseminated into the marketplace." *Id.*

Because electronically stored child-pornographic images produced for personal use could, in the aggregate, have a "substantial effect" on national and international markets for child pornography, it was reasonable for Congress to conclude that prohibiting non-commercial production of child pornography abroad was necessary to combat the growing international market in child pornography. Therefore, as applied to Park's conduct, Congress has not exceeded its constitutional authority.

## 2. The PROTECT Act's prohibition of United States citizens engaging in non-commercial child sex abuse abroad is a valid exercise of Congress's foreign commerce power.

Although the point is a closer one, the PROTECT Act's prohibition against U.S. citizens engaging in non-commercial child sex abuse abroad is also within Congress's foreign commerce power. "[N]on-commercial sexual abuse of minors can drive commercial demand for sex with minors by reinforcing the idea that such conduct is acceptable, or by allowing traffickers to use non-commercial arrangements to entice patrons into engaging in subsequent commercial behavior." *Lindsay*, 931 F.3d at 863. As discussed in detail in Part II.A.2, leaving such a critical gap could also encourage U.S. citizens to travel or relocate to foreign countries that do not, or cannot, successfully police child sexual abuse, thereby "affect[ing] the price for child prostitution services and other market conditions in the child prostitution industry." *Bollinger*, 798 F.3d at 219 (quoting *United States v. Martinez*, 599 F. Supp. 2d 784, 808 (W.D. Tex. 2009)).

Criminalizing non-commercial sexual abuse is also conducive to eliminating commercial child exploitation "given the enforcement difficulties" posed by a requirement to prove a *quid-pro-quo* transaction. *See Raich*, 545 U.S. at 22. Proof of the commercial aspect of child sexual exploitation can be exceptionally elusive. International child sex tourists often use "travel agencies, transport, accommodation and other tourism-related services that facilitate contact with children," 2012 U.N. Report at 5, and everyone involved has strong incentives to disguise their unlawful activities. Tour operators, for example, charge for seemingly legitimate "fishing trips" as a cover for arranging sexual access to juveniles. *See* Appellant Br. 20 (quoting ECPAT International, *Offenders on the Move,*

*Global Study on Sexual Exploitation of Children in Travel and Tourism* 61 (2016)). Some experts report that sexual predators attempt to gain sexual access to children through a process of "grooming," in which the abuser uses "inducements" such as "money, treats, gifts, [and] fun trips . . . to establish trust, which then allows the offender to control and manipulate the child into participating in sexual abuse." Georgia M. Winters & Elizabeth L. Jeglic, *Stages of Sexual Grooming: Recognizing Potentially Predatory Behaviors of Child Molesters*, 38 Deviant Behav. 724, 726 (2017). The transactional component of such inducements is systematically denied by and hidden from the child, the child's family, and the community, which makes it challenging for law enforcement to uncover. *See id.* at 724-25. Given the nature of commercial child sexual exploitation, Congress had a rational basis to conclude that a law requiring proof of commercial activity would result in dramatic underenforcement.

To be sure, child sexual abuse may not be "quintessentially economic" in every case. *Cf. Raich*, 545 U.S. at 25. Park therefore argues that such activity is ineligible for aggregation under the Interstate Commerce Clause framework. *Cf. Morrison*, 529 U.S. at 617 (holding that Congress exceeded its interstate commerce powers in enacting a civil remedy for victims of gender-motivated violence). But because Park brings an as-applied challenge, we must assess the "statute's constitutionality with respect to the particular set of facts before [us]," *Hodge*, 799 F.3d at 1156, and evaluate Park's argument in light of the alleged facts that the parties agree we must take as true.

Unlike the gender-motivated violence at issue in *Morrison*, Park's alleged acts have features of market-affecting, transactional economic activity. The government alleges that Park has traveled throughout the world seeking out

opportunities for child sex abuse. In Vietnam, he worked as a foreign language teacher, offering English language instruction to gain access to children. Indeed, Park was able to meet and introduce himself to the specific victim at issue by offering English lessons. And Park is alleged to have used the prospect of English lessons to invite the child to his apartment. Congress had ample reason to conclude that this kind of tacit and informal exchange to achieve child sexual exploitation, when aggregated, has a substantial effect on the market for prostitution and sex trafficking of children. Without discounting the possibility that some applications of this statute may exceed Congress's authority, we are therefore satisfied on the facts here that Park's conduct may be regulated under Congress's foreign commerce power.

Park's final objection is that applying the "substantial effects" test in this context permits Congress to act as the "world's lawgiver" in derogation of the independent sovereignty of other nations. *See Baston v. United States*, 137 S. Ct. 850, 850 (2017) (Thomas, J., dissenting from denial of certiorari). But the exercise of foreign commerce power here does not interfere with foreign sovereignty: Congress has legislated within a consensually established international regulatory framework, the statute's extraterritorial reach is confined to the conduct of U.S. citizens and aliens admitted for permanent residence, and Vietnam makes no sovereignty-based objection to Park's prosecution in the United States (nor could it). By ratifying the Protocol, Vietnam adopted the Protocol's general goal to strive for the "elimination . . . of child prostitution and child pornography," Optional Protocol, preamble, and invited the United States to apply its pertinent criminal law to conduct by U.S. nationals within Vietnam. Moreover, "courts have long recognized that Congress may criminalize many actions that target U.S. nationals or interests abroad, or provide for the prosecution of much conduct by U.S.

nationals or organizations overseas." *Sealed Case,* 2019 WL 4123971, at *4. However judicially unexplored the outer limits of Congress's foreign commerce powers may be, it is clear that—at least where, as here, there is no interference with foreign sovereignty—Congress can regulate the economic activity of U.S. citizens abroad that could, in the aggregate, undermine a comprehensive international legal regime designed to prevent transnational exploitation of children.

\*   \*   \*

We conclude that Congress was acting well within its authority to "make all Laws which shall be necessary and proper" to carry into effect the federal government's treaty power when it enacted the PROTECT Act to implement the Optional Protocol, an internationally agreed upon regulatory framework that encourages signatories to assume nationality jurisdiction over their nationals' sexual exploitation of children abroad. Congress's power to enact the PROTECT Act is further bolstered by its authority to "regulate Commerce with foreign Nations." Therefore, we hold that 18 U.S.C. §§ 2424(c), (e), (f)(1), and (f)(3) are constitutional as applied to Park's indictment. We reverse the district court's dismissal of the indictment and remand for further proceedings consistent with this opinion.

*So ordered.*

GRIFFITH, *Circuit Judge*, concurring in part and concurring in the judgment: I agree with my colleagues that the treaty power authorizes Congress to make criminal Park's conduct. *See Missouri v. Holland*, 252 U.S. 416 (1920). Although *Holland*'s premise—that Congress can do by legislation pursuant to a treaty what it cannot do by ordinary legislation that reaches beyond its enumerated powers—has come in for some criticism, *see, e.g.*, *Bond v. United States*, 572 U.S. 844, 873-82 (2014) (Scalia, J., concurring in the judgment); *id.* at 882-96 (Thomas, J., concurring in the judgment), it remains binding upon this Court and controls the outcome of this case.

Because the statute criminalizing Park's conduct is constitutional as applied under the treaty power, we have no need to address the more challenging question of whether the Foreign Commerce Clause also authorizes Congress to act here. *See Cohen v. Bd. of Trs. of the Univ. of D.C.*, 819 F.3d 476, 485 (D.C. Cir. 2016) ("[T]he cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further." (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment))); *see also Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."). For this reason I decline to join part II.B of the majority opinion.